OIL, CHEMICAL AND ATOMIC WORK-ERS INTERNATIONAL UNION, LOCAL 1–547, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

Chevron, USA, Respondent–Intervenor.

No. 85–7574.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 4, 1987.

Decided March 28, 1988.

Wallace B. Knox, Karp & Mooney, Los Angeles, Cal., for petitioner.

John H. Ferguson, Deputy Asst. Gen. Counsel, Washington, D.C., for respondent.

Richard D. DeLuce, Lawler, Felix & Hall, Los Angeles, Cal., for respondent-intervenor.

Jeffrey B. Demain, Altshuler & Berzon, San Francisco, Cal., for amicus.

Before HUG and WIGGINS, Circuit Judges, and PRICE,* District Judge.

HUG, Circuit Judge:

This case involves the interpretation of a no-strike clause in a collective bargaining agreement, and its application to a sympathy strike. Chevron U.S.A., Inc. ("Chevron") suspended members of the Oil, Chemical and Atomic Workers International Union, Local 1-547 ("the Union" or "Local 1-547") for one day when they engaged in a sympathy strike. The Union filed an unfair labor practice complaint with the National Labor Relations Board ("NLRB" or "the Board"), alleging violations of sections 8(a)(1) and 8(a)(3) of the National Labor Relations Act ("NLRA"), 29 U.S.C. §§ 158(a)(1) and 158(a)(3) (1982). The Union petitions for review of the NLRB's dismissal of its complaint.

I.

On January 28, 1980, approximately 240 Local 1-547 members refused to cross a picket line at the Chevron plant where they were employed. The picket line was formed by another Union local from the Chevron plant. Chevron suspended the Local 1-547 members for one day, claiming they had violated the no-strike clause included in their collective bargaining agreement. Article XXI of the agreement provided:

ARTICLE XXI—STRIKES AND LOCKOUTS

During the term of this Agreement there shall be no strikes, stoppages of work, slowdowns, or other intentional interferences with production. The company agrees there will be no lockouts.

This clause was in the collective bargaining agreement between the Union and Chevron since at least 1959. In recent years, the only discussions concerning its effect took place during the negotiations for the 1977-79 agreement. The Union introduced a clause specifically allowing sympathy strikes, but then withdrew it. Throughout the negotiations, the Union maintained it was merely trying to reinforce a right it felt it already had under the collective bargaining agreement and the NLRA.

In 1977, after negotiations were complete, Chevron disciplined employees who engaged in another sympathy strike. The Union took a grievance to arbitration. The arbitrator decided that the broad no-strike clause in the agreement waived the Union's statutory right to engage in sympathy strikes.

---

* Honorable Edward Dean Price, United States District Judge, Eastern District of California, sitting by designation.

However, in 1978, the NLRB held that broad no-strike language does not in itself constitute a waiver of the right to engage in sympathy strikes. The burden fell on the employer to show clearly and unmistakably that the union intended to waive this right. *Davis–McKee, Inc.*, 238 NLRB 652 (1978).

The parties entered into a new agreement in 1979, maintaining the previous no-strike clause without discussion. This 1979–81 agreement was in effect at the time of the 1980 sympathy strike at issue in this case.

On July 22, 1981, an administrative law judge ("ALJ") found that the no-strike clause in the collective bargaining agreement did not waive the statutory right to engage in sympathy strikes, following *Davis–McKee*. He also found it inappropriate to defer to the earlier arbitration decision, finding it "clearly repugnant" to the NLRA under then-current law. Since the Union's right to strike had not been waived, he found that Chevron had violated sections 8(a)(1) and 8(a)(3) of the NLRA. Chevron filed exceptions to the decision and the Union filed cross-exceptions. Almost four years later, the NLRB reversed the ALJ's decision, deferring to the 1978 arbitrator's decision, which construed the agreement's no-strike clause as a waiver of sympathy strike rights. The Board also relied on its recent decision in *Indianapolis Power & Light*, 273 NLRB 1715 (1985), which overruled *Davis–McKee*. *Indianapolis* held that a broad no-strike clause bans all strikes, including sympathy strikes, un-less there is clear evidence that the parties intended otherwise.

## II.

■ The right to engage in a sympathy strike is guaranteed by section 7 of the NLRA, 29 U.S.C. § 157 (1982). This right can be waived by a collective bargaining agreement if the waiver is "clear and unmistakable." *See Metropolitan Edison Co. v. NLRB*, 460 U.S. 693, 708, 103 S.Ct. 1467, 1477, 75 L.Ed.2d 387 (1983); *NLRB v. Southern California Edison Co.*, 646 F.2d 1352, 1364 (9th Cir.1981).

"Whether the contract waives the employees' right to strike 'turns upon the proper interpretation of the particular contract before us. Like other contracts, it must be read as a whole and in light of the law relating to it when made.'" *IBEW Local 387 v. NLRB (Arizona Public Service Co.)*, 788 F.2d 1412, 1414 (9th Cir.1986) (quoting *Mastro Plastics Corp. v. NLRB*, 350 U.S. 270, 279, 76 S.Ct. 349, 356, 100 L.Ed. 309 (1956)). The language of the no-strike clause does not specify whether sympathy strikes are included or excluded from the prohibition.[1]

■ The Union argues that the phrase "or other intentional interferences with production" is significant. The argument is that the use of the word "intentional" in the phrase means that any strike would also have to be an intentional interference with production. The Union contends that a sympathy strike is not an intentional interference with production but, instead, an intention to achieve solidarity with another

---

1. The NLRB order must be enforced if the Board correctly applied the law. *NLRB v. Island Film Processing Co., Inc.*, 784 F.2d 1446, 1450 (9th Cir.1986). The Board's interpretation of the NLRA will be upheld if reasonable. *Ford Motor Co. v. NLRB*, 441 U.S. 488, 497, 99 S.Ct. 1842, 1849, 60 L.Ed.2d 420 (1979); *Whisper Soft Mills, Inc. v. NLRB*, 754 F.2d 1381, 1384–85 (9th Cir.1984). Furthermore, so long as the Board's interpretation of contract terms is reasonable, it is entitled to deference. *NLRB v. Southern California Edison Co.*, 646 F.2d 1352, 1362 (9th Cir.1981). *But see Local Union 1395, IBEW v. NLRB*, 797 F.2d 1027, 1030 (D.C.Cir.1986) (Board's interpretation of contractual provisions is entitled to "no particular deference" so as to prevent the development of two different stan-dards of interpretation of collective bargaining agreements—the Board's and that which the courts develop in suits under Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185 (1982). If, however, an agency departs from its prior standards, the reviewing court should carefully consider the consistency of the change with the agency's mandate. *Atchison, Topeka & Santa Fe Ry. v. Wichita Board of Trade*, 412 U.S. 800, 807–08, 93 S.Ct. 2367, 2374–75, 37 L.Ed.2d 350 (1973); *Continental Web Press v. NLRB*, 742 F.2d 1087, 1089 (7th Cir. 1984). The court also need not defer if the Board abuses its discretion by failing to follow its own standards. *See, e.g., Ad Art, Inc. v. NLRB*, 645 F.2d 669, 675 (9th Cir.1980).

union. We disagree. The clear intention of a sympathy strike is to interfere with production, in order to achieve solidarity. Thus, we do not agree that the plain language of the clause compels a conclusion that sympathy strikes were omitted from the operation of the no-strike provision.

■ The intent of the parties cannot be determined from the language of the clause itself, without examining pertinent, extrinsic evidence. Relevant considerations include the bargaining history, the parties' interpretation of the contract, the conduct of the parties, and the legal context in which the contract was negotiated. *Arizona Public Service Co.*, 788 F.2d at 1414. Another factor is the doctrine of coterminous interpretation, which states that a no-strike obligation is limited to arbitrable issues. *Gateway Coal Co. v. Mine Workers*, 414 U.S. 368, 381–82, 94 S.Ct. 629, 638–39, 38 L.Ed.2d 583 (1974). If the arbitration clause and the no-strike clause in a contract are functionally linked, strong evidence exists that the parties did not intend a waiver of the sympathy strike right. *NLRB v. Sav-On Drugs, Inc.*, 728 F.2d 1254, 1257 (9th Cir.1984) (en banc); *Southern California Edison*, 646 F.2d at 1367; *accord Gary Hobart Water Corp. v. NLRB*, 511 F.2d 284, 287–88 (7th Cir.), *cert. denied*, 423 U.S. 925, 96 S.Ct. 269, 46 L.Ed. 2d 252 (1975).

This analysis—examining the statutory language in conjunction with extrinsic evidence—is equally applicable in each of the Board's rulings concerning no-strike clauses. In *Indianapolis*, the Board established that a general no-strike clause waives the right to engage in sympathy strikes, unless there is extrinsic evidence that the parties intended otherwise. 273 NLRB 1715 (1985), *rev'd*, *Local Union 1395, IBEW v. NLRB*, 797 F.2d 1027, 1030 (D.C.Cir.1986) (Board's decision was reversed due to its failure to address the relevant extrinsic evidence of the parties' intent). This decision overruled established Board precedent that broad no-strike language does not in itself constitute a waiver of the right to engage in sympathy strikes; the burden fell on the employer to show clearly and unmistakably that the union intended to waive this right. *Davis-McKee*, 238 NLRB 652. Thus, *Indianapolis* shifts the presumption to benefit the employer. *See Arizona Public Service Co.*, 788 F.2d at 1414.

An analysis of the various indicators of intent is necessary in this case given the inconclusive nature of the clause's language itself. The Board's decision, however, is cursory, and suffers the same general defects which have led the courts in earlier cases to reverse and remand Board cases which apply the *Indianapolis* standard. *See Local Union 1395*, 797 F.2d at 1027; *Arizona Public Service Co.*, 788 F.2d at 1412.

■ Furthermore, it is inappropriate to apply retroactively the new *Indianapolis* standard to interpret the collective bargaining agreement in this case, since the new placement of the presumption could not have been anticipated by the parties and thus could not have been their intent.[2]

2. The question of whether new standards should be applied retroactively is one of law, which we review under the *de novo* standard. *United States v. McConney*, 728 F.2d 1195, 1201 (9th Cir.) (en banc), *cert. denied*, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984); *NLRB v. Guy F. Atkinson Co.*, 195 F.2d 141, 148–51 (9th Cir. 1952) (decision of retroactive application not one within agency's special competence, therefore not subject to deference).

The NLRB contends that the Union is precluded from arguing against the retroactive application of *Indianapolis*, since it did not raise the issue before the Board. *See supra* n. 1. This argument has been squarely rejected by both the Seventh and D.C. Circuits. *NLRB v. Wayne Transp., A Div. of Wayne Corp.*, 776 F.2d 745, 749 (7th Cir.1985); *Local 900, Int'l Union of Elec., etc. v. NLRB (Gulton)*, 727 F.2d 1184, 1193 (D.C.Cir.1984). These cases reason that the issues had been presented to the Board and the objecting party had argued for a continuation of the current standards. Retroactivity is necessarily an issue any time a new rule of law is formulated. This fact, combined with the Board's extensive experience with retroactivity problems, should have alerted the Board to the Union's likely objection to the retroactive application of their new rules of law. We adopt these decisions as Ninth Circuit law.

The NLRB's reliance on *Woelke & Romero Framing, Inc. v. NLRB*, 456 U.S. 645, 665–66, 102 S.Ct. 2071, 2082–83, 72 L.Ed.2d 398 (1982) and *Garment Workers v. Quality Mfg. Co.*, 420 U.S. 276, 281 n. 3, 95 S.Ct. 972, 975 n. 3, 43 L.Ed.2d

The Ninth Circuit has adopted a five-part analysis to balance the interests in considering retroactive application of a new rule of law. *Montgomery Ward & Co. v. FTC*, 691 F.2d 1322, 1333 (9th Cir.1982), *citing Retail, Wholesale and Dept. Store Union v. NLRB*, 466 F.2d 380, 390–93 (D.C.Cir. 1972). The relevant factors are:

> (1) whether the particular case is one of first impression, (2) whether the new rule represents an abrupt departure from well established practice or merely attempts to fill a void in an unsettled area of law, (3) the extent to which the party against whom the new rule is applied relied on the former rule, (4) the degree of the burden which a retroactive order imposes on a party, and (5) the statutory interest in applying a new rule despite the reliance of a party on the old standard.

*Id.*

The *Indianapolis* decision shifted the presumption that the Board applies to no-strike clauses, and the corresponding burden of proof, 180 degrees. The extent to which the Union relied on prior law is unclear, and is precisely the type of extrinsic evidence which the Board has not examined, yet must. The retroactive shifting of the presumption not only ignores the parties' intent at the time the contract was made, it burdens the Union with an interpretation of a clause which is exactly the opposite of the NLRB's interpretation at the time. Thus, the Union would bear the burden of proving the clause did not waive sympathy strikes, while, before, the employer needed to prove such waiver was intended. This burden is significant, as the Union might have continued to bargain for the express exclusion of sympathy strikes, had it known it would be required to prove intent. The statutory or regulatory interest in applying the new standard is small. The concern or goal in contractual interpretation is to discover the parties' intent, and interpretive rules should improve this process, not work to undermine it by ignoring the state of the law at the time a contract is formed. Finally, we note that this case was pending before the NLRB for four years. But for this delay, the case would have been decided under the earlier presumption. Given these circumstances, the statutory interest in applying the new standard is especially weak.

Having decided that retroactive application of the *Indianapolis* standard is inappropriate, we return to a discussion of the extrinsic evidence of intent. We identify such extrinsic considerations to demonstrate the necessity that the Board undertake such analysis to determine the intent of the collective bargaining parties. We look first to the bargaining history and the parties' conduct. Two bargaining agreements are relevant to this case. The first, effective from 1977–79, was in effect at the time of the earlier sympathy strike and the arbitration decision holding that such strikes were included in the no-strike clause and thus waived. The 1979–81 agreement was in effect at the time of the sympathy strike at issue in this case.[3]

189 (1975) is misplaced as those cases deal with a very different situation. In both cases the Board decided an issue which had not been presented to it; the Supreme Court held that under those circumstances, a motion for reconsideration must be filed to preserve appellate review. Here, while the precise issue of retroactivity was not before the Board, the Board necessarily had notice that it was an issue which would be raised by the parties if the rule of law was changed.

**3.** The administrative law judge ("ALJ") treated the collective bargaining agreement as one four-year agreement. The NLRB asserts that we must also treat it as a four-year agreement since the Union never objected to this finding. This court's jurisdiction to review specific objections to a NLRB order is limited by section 10(e), which states that "[n]o objection that has not been urged before the Board ... shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances." 29 U.S.C. § 160(e) (1982). Section 10(f) incorporates this same standard by reference. 29 U.S.C. § 160(f) (1982). The purposes of this limitation on court review are to allow the Board notice and the opportunity to resolve all issues which are within its jurisdiction. *Marshall Field & Co. v. NLRB*, 318 U.S. 253, 255–56, 63 S.Ct. 585, 586, 87 L.Ed. 744 (1943) (per curiam).

In most cases it is necessary to file an exception with the Board to any factual decision of the ALJ which will be disputed. *See, e.g., NLRB v. Apico Inns of Cal., Inc.*, 512 F.2d 1171, 1174 (9th Cir.1975). However, the Union's failure to

The no-strike clause remained the same in both contracts, as the 1977–79 agreement was extended in 1979 without any further face-to-face bargaining. In the 1977 negotiations, the Union first proposed, and then withdrew, language explicitly allowing sympathy strikes. At all times, however, the Union indicated that it believed this would simply provide explicit recognition of a right they already had. *See Southern California Edison*, 646 F.2d at 1366 (failure to obtain a contractual confirmation of a right is evidence of waiver only if it shows that the union thought the right had been waived by other provisions of the contract and sought to regain the right). The Union's belief was not without basis, as Chevron had apparently not disciplined sympathy strikers for years.

In 1977, however, after negotiations were complete, Chevron disciplined sympathy strikers. The no-strike clause was interpreted by an arbitrator as including sympathy strikes, and Chevron's disciplinary action was upheld.

Then, in 1978, the NLRB decided *Davis–McKee*, which held that broad no-strike clauses were presumed *not* to prohibit sympathy strikes unless the bargaining history indicated otherwise. 238 NLRB 652. It was against this background of directly conflicting interpretations of broad no-strike language that the parties entered into the 1979–81 agreement without further negotiation. The law in effect at the time the contract is formed is another indication of the parties' intent, and thus this conflict must be considered by the NLRB, since a contract is interpreted in light of the law when last ratified. *Mastro*, 350 U.S. at 279, 76 S.Ct. at 356; *Southern California Edison*, 646 F.2d at 1365.

The D.C. Circuit has argued that an assumption of *sub silentio* incorporation of existing law under these same facts goes too far. *Local Union 1395*, 797 F.2d at 1035 & n. 8 (citing the Board's decision in

the case before us giving great deference to arbitrator's decision). It is important to note, however, that the Seventh Circuit, where the *Local Union 1395* contract was entered and ratified, had rejected the *Davis–McKee* approach, *see W–I Canteen Serv., Inc. v. NLRB*, 606 F.2d 738 (7th Cir.1979), whereas there is no indication that the Ninth Circuit was dissatisfied with *Davis–McKee*.

The analysis of this case thus poses the challenge of searching for the parties' intent given opposing indicators. The then-current NLRB law indicated the Union could safely engage in sympathy strikes; the 1977 arbitration decision signalled that disciplinary action would be allowed if Union members honored others' picket lines.

■ It is inappropriate under these circumstances for the Board to defer to the arbitrator's decision by simply citing *Olin Corp.*, 268 NLRB 573 (1984). To do so ignores the complexity of the extrinsic evidence available in this case, and is unfaithful to the Board's own standard for determining the scope of a no-strike clause. *See Indianapolis*, 273 NLRB at 1715.

It is therefore unnecessary for us to address the validity of the *Olin* deferral standard and whether it is an improper abdication of the NLRB's obligation to resolve unfair labor practice disputes. We also need not address whether the Board adequately explained the factual parallel between the contract and statutory claims in making its decision to defer to the arbitrator. *See Darr v. NLRB*, 801 F.2d 1404 (D.C.Cir.1986). The Board now, in reconsidering the case and its deferral decision, can remedy any possible error in the manner in which it handled this aspect of its earlier decision.

Furthermore, due to our decision to remand based on the Board's failure to examine extrinsic evidence of intent, it is unnecessary for us to address whether the *In-*

object on this specific issue does not preclude this court from considering the two separate contracts. Chevron is asking the court to ignore exhibits entered into evidence in the proceeding before the ALJ—the two separate agreements. Thus, we have a clearly erroneous factual state-

ment by the ALJ which is belied by the very evidence in the record. We decline to shut our eyes, and proceed to analyze this case based upon the two separate collective bargaining agreements which, in fact, exist.

*dianapolis* standard is proper under the NLRA.

We therefore reverse and remand for the NLRB to consider the relevant extrinsic evidence.

REVERSED and REMANDED.